689 S.E.2d 757

Glen Patrick MERRITT

v.

COMMONWEALTH of Virginia.

Record No. 1871–08–1.

Court of Appeals of Virginia,
Chesapeake.

March 2, 2010.

720

722

From the Circuit Court of the City of Virginia Beach, William R. O'Brien, Judge.[1]

Harry Dennis Harmon, Jr., Norfolk, for appellant.

Josephine F. Whalen, Assistant Attorney General II (William C. Mims, Attorney General, on brief), for appellee.

Present: HUMPHREYS and McCLANAHAN, JJ., and WILLIS, Senior Judge.

HUMPHREYS, Judge.

Glen Patrick Merritt ("Merritt") was convicted in a jury trial of possession of a controlled substance with the intent to distribute MDMA (ecstasy), second or subsequent offense, Code § 18.2–248; transporting into the Commonwealth one ounce or more of a Schedule I or II controlled substance with

---

1. Judge Patricia L. West presided over the hearing on the motion to suppress the evidence.

the intent to distribute, Code § 18.2–248.01; and conspiracy to distribute MDMA, Code § 18.2–256. Merritt was sentenced by the trial court to eighteen (18) years in the Virginia State Penitentiary with eleven (11) of those years suspended for a period of eleven (11) years of indeterminate supervised probation. His privilege to operate a motor vehicle was also suspended for eighteen (18) months.

Merritt argues that the trial court erred when it denied his motion to set aside the verdict as the evidence was insufficient to convict him of possession and transportation of ecstasy with intent to distribute, as well as conspiracy to distribute ecstasy.[2] Lastly, Merritt filed a motion to set aside the jury verdict and grant a new trial in light of after-discovered evidence. For the following reasons, we reverse the convictions and dismiss the indictment.

## BACKGROUND

■ On appeal, we review the evidence in the "light most favorable" to the Commonwealth. *Commonwealth v. Hudson,* 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth,* 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (citation omitted). So viewed, the evidence is as follows.

On August 6, 2006, Virginia Beach police officers were conducting drug interdiction surveillance around 12:30 a.m. at a bus stop in an area of Virginia Beach known for its drug trafficking. The bus stop, located in a shopping center, ser-

---

2. Merritt's brief contains another question presented: "The trial court erred in denying the appellant's motion to suppress the physical evidence because the police lacked probable cause and any reasonable suspicion that any criminal activity was afoot." Counsel for appellant conceded at oral argument that this issue was not preserved and not properly before this Court. Therefore, we do not address this issue further.

viced non-stop buses from New York City, a source city from which illegal drugs are imported into Virginia.

Detective Massetti ("Massetti") arrived at the bus stop with his K–9, Sheena, and ran toward the bus as it pulled into the station. As he ran toward it, he passed a silver Lexus. Two other officers on site, Detective Kenneth Dmitry ("Dmitry") and Officer Christopher Biswurm ("Biswurm"), noticed the two individuals in the Lexus, Merritt and Perry Bolton ("Bolton"), "snap[ ] their heads around" and watch Massetti as he ran toward the bus. Both officers thought this type of behavior and concentration on Massetti was unusual. Bolton then moved the car to a parking space in a darker area of the parking lot. Bolton remained in the car while Merritt, who was in the passenger seat, got out of the vehicle and stood at the rear of the bus scanning the crowd. Merritt held a cell phone to his ear as if talking on the phone but did not speak into it. From this vantage point Merritt could observe the bus passengers and two of the detectives that were on site.

Upon reaching the bus, Massetti took Sheena through the luggage compartment to see if she would alert on anything. When Sheena did not alert on anything in the luggage compartment, he took her and stood near the crowd and watched for any unusual reactions of people to his presence there. Massetti noticed Perry McDaniels ("McDaniels") and Erica Spratley ("Spratley") who had just gotten off the bus. McDaniels retrieved a black suitcase from the bus and walked with Spratley through the parking lot. Merritt followed about thirty (30) feet behind McDaniels and Spratley as they walked toward the Lexus with the suitcase that they retrieved from the bus. However, Merritt never acknowledged them.

Massetti then went to his supervisors, Dmitry and Sergeant Brereton ("Brereton"), who were on site, and, at their direction to keep an eye on the Lexus, approached the Lexus at the point when Bolton exited the car and assisted McDaniels and Spratley by taking and putting the suitcase into the trunk. Merritt did not return to the car, but walked past it and stood several feet away. As Massetti came around the car, the

individuals started getting into the vehicle. McDaniels got in the driver's seat while Bolton and Spratley got in the backseat. After the others were in the car, Merritt returned to the passenger seat.

Upon reaching the Lexus, Massetti noticed the corner of a plastic sandwich bag with a white powder residue on the ground outside the passenger door. Because of his training and knowledge that a baggie corner is used for and associated with narcotics use and distribution, Massetti ran back to his car, put Sheena in the car, and returned to the Lexus. When he returned to the Lexus, Massetti approached McDaniels in the driver's seat and showed him and the other occupants his badge because he was in plain clothes.[3] He asked McDaniels if there were any drugs in the car and if he knew anything about the plastic baggie corner on the ground outside the passenger door. When McDaniels replied that he did not know about the plastic baggie, Massetti asked him for his identification. As Massetti was conversing with McDaniels, he noticed Merritt fidgeting in the passenger seat, leaning towards the center console and manipulating something bulky in his left front pocket. Massetti then asked if there were any weapons or drugs in the car to which Bolton replied that he had a .45 caliber handgun in the center console and a magazine in the glove compartment.

Biswurm had arrived at this point and was standing outside of Merritt's door, and Dmitry and Brereton had also come up on the side of the car. The officers pulled everybody out of the vehicle and patted them down for weapons. A small penknife was found on Merritt that was part of his belt buckle, and two cell phones that had been the bulky item in his left front pocket. The officers then had the individuals stand in front of the Lexus while Massetti retrieved the handgun from the center console and the magazine from the glove compartment. As he was retrieving these items, Massetti noticed a small plastic bag with blue powder in it sticking out of a small

---

**3.** It was established at the suppression hearing that McDaniels was the owner of the car.

compartment to the left of the steering wheel. He suspected that the powder was ecstasy and removed the bag. Upon removing it, he discovered it contained a broken capsule which was not "a pharmacy or commercially manufactured capsule," but one commonly used for heroin. The blue powder was field tested and tested positive for ecstasy.

The officers then conducted a search of the Lexus and discovered marijuana flakes and seeds throughout the vehicle, and the following in the backseat of the vehicle: a blue spiral personal notebook containing drug notes, a receipt for several hundred small plastic bags, four one-way bus tickets to and from Norfolk[4] and New York dated July 27, 2006, and a Western Union receipt for $125 from Bolton to Merritt in Manhattan dated August 2, 2006. A search of the trunk uncovered Spratley's and McDaniels' suitcase containing women's clothes and shoes and a heat-sealed bag with 998 tablets of ecstasy.[5] The blue spiral notebook contained an annotation "GMNY 1000." After the suitcase was opened and the large quantity of ecstasy discovered, the officers arrested Merritt and the three other occupants of the vehicle.

After arresting the four individuals, the officers seized $1,336 and $1,410 in cash from Bolton and McDaniels. The money was later screened by a narcotics dog that alerted to it. In addition, the officers seized two cell phones from Merritt, a cell phone from Bolton, and a cell phone from McDaniels. In Bolton's cell phone, they found an entry for "G–Money" which was assigned to one of the cell phones they discovered on Merritt. Upon looking at the call records in all the phones, the officers discovered that there had been a large number of calls between the phones in recent days.

4. While it might be confusing that the four bus tickets are to and from the City of Norfolk when the bus station involved here is actually located in Virginia Beach, we are bound by the record before us which notes that the tickets were to and from Norfolk. However, the discrepancy between the ticketed location and the actual location of the bus station is immaterial to any issue on appeal.

5. Spratley told the officers that she and McDaniels purchased the suitcase in New York that day along with the other items found in it.

After Merritt was arrested and read his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he agreed to talk with Massetti. During this conversation, he informed Massetti that he was on his way to his girlfriend's house when Bolton offered him a ride and was informed by Bolton that they needed to first stop at the bus station. Merritt further stated that Bolton told him to get out of the car and walk to the bus, and so he did so without knowing why Bolton told him to. Merritt corrected Massetti and told him he had not carried the suitcase when Massetti said he saw Merritt carrying it. Merritt also stated that he did not know McDaniels, but upon further questioning by Massetti, Merritt admitted that he had known McDaniels in middle school.

Massetti was qualified at trial as an expert on drug dog procedures and distribution procedures. He testified that the large quantity of drugs discovered was inconsistent with personal use. Massetti also explained that the Western Union receipt from Bolton to Merritt was significant in that Western Union is commonly used in the drug trade as a way of transferring money to pay for drugs or services. Massetti further testified regarding Merritt's two cell phones that two cell phones are commonly carried and used in illegal narcotics trade, one for personal use and the other for business. With regard to the type of baggies indicated on the receipt discovered near Bolton, Massetti explained that those are the type commonly used to package and distribute drugs.

Massetti then went on to explain the different roles that individuals have with regard to a drug operation. Each operation has a primary dealer who handles the money and actual distribution of the drugs. Then there is a secondary person who is the muscle of the operation who is usually bigger physically or armed. Lastly you have the "mules" who are paid to obtain the drugs and bring them back in to Virginia. Massetti opined that Merritt was the muscle man of the group based on his observations, training, and the evidence before the court.

Virginia Beach Detective Thomas Fowler ("Fowler") also testified for the Commonwealth as an expert witness in the use, packaging, and distribution of narcotics. Fowler testified that the ecstasy in this case was inconsistent with personal use based on its condition, quantity, and packaging. He then explained that ecstasy tablets do not last long since they are not professionally packaged and would become powder in a year, making the packaging of 998 tablets inconsistent with personal use. In addition, he stated that the effects of the pills last two (2) to eight (8) hours and it would take an individual user 90–330 days of continuous use to consume all 998 tablets. Also, the value of an ecstasy tablet in New York is $4–$7 whereas in Virginia Beach and Hampton Roads it is $15–$30, which would give an individual a profit on 998 tablets of $10,000–$30,000. Lastly, Fowler testified that ecstasy used for personal use is typically packaged in small glassine or jewelry type bags, regular sandwich bags tied off and ripped off, or Ziploc bags containing quantities of one (1) to possibly as many as ten (10) tablets.

Fowler also testified with regard to illegal narcotics distribution and its distribution organization. He explained that an enforcer or lookout has two purposes: the primary purpose is to protect the product or the distributor to ensure that the transaction goes smoothly while his secondary purpose is to accept or chase down payments for the drugs. Because of the enforcer's primary purpose, he is often willing to carry a firearm or some other weapon and is not afraid to use it. Fowler stated that in his opinion the transaction in this case was a drug transaction based on his training and experience, the multiple cell phones, the Western Union receipt, the large amount of cash found, the drug dog alerting on the cash, and other facts in the case.

On October 2, 2006, Merritt was indicted for possession of ecstasy with intent to distribute, conspiracy to distribute ecstasy, and transporting ecstasy into the Commonwealth with the intent to distribute. On July 2, 2007, the Commonwealth amended Merritt's indictment to possession of ecstasy with intent to distribute, second or subsequent offense. On July 3,

2007, a jury found Merritt guilty of possession of ecstasy with intent to distribute, second or subsequent offense, conspiracy to distribute ecstasy, and transporting ecstasy into the Commonwealth with the intent to distribute. The jury sentenced him to 75 years, and the trial court denied Merritt's motion to vacate and set aside the jury verdict. On September 3, 2007, the trial court modified the sentence and sentenced Merritt to eighteen (18) years with eleven (11) years suspended and also suspended his privilege to operate a motor vehicle for eighteen (18) months.

On July 31, 2008, Merritt filed a timely appeal, and this appeal followed.

## ANALYSIS

### I. *Motion to Set Aside Jury Verdict and Grant New Trial*

Merritt filed a motion to set aside the conviction and sentencing and grant a new trial with this Court in light of after-discovered evidence. The certified copy of the Norfolk circuit court conviction/sentencing order improperly stated Merritt had been found guilty of possession of cocaine with the intent to distribute on July 27, 2000, when he had only been found guilty of possession of cocaine. Specifically, Merritt contends that the after-discovered evidence was the revelation at his subsequent probation revocation hearing that the conviction/sentencing order admitted without objection at trial to establish that he had previously been convicted of possession with intent to distribute cocaine, was erroneous in that he was actually convicted previously only of simple possession of cocaine.[6]

---

6. The Commonwealth attorney's response in the trial court to Merritt's motion for a new trial based upon after-discovered evidence was that any error in the conviction/sentencing order did not constitute newly discovered evidence since Merritt was presumably well aware of his prior record when he failed to object to the introduction of the conviction/sentencing order because he pleaded guilty to simple possession of cocaine in the earlier case and executed a written plea agreement in which he agreed to do so.

■ " 'The Court of Appeals of Virginia is a court of limited jurisdiction. Unless a statute confers jurisdiction in this Court, we are without power to review an appeal.' " *Prizzia v. Prizzia,* 45 Va.App. 280, 286, 610 S.E.2d 326, 329 (2005) (quoting *Canova Elec. Contracting, Inc. v. LMI Ins. Co.,* 22 Va.App. 595, 599, 471 S.E.2d 827, 829 (1996)).

> Code § 17.1–406(A) provides that "any aggrieved party may present a petition for appeal to the Court of Appeals from ... any final conviction in a circuit court of ... a crime." The statutory language is restrictive, limiting the Court of Appeals' appellate jurisdiction to appeals from final criminal convictions and from action on motions filed and disposed of while the trial court retains jurisdiction over the case.

*Commonwealth v. Southerly,* 262 Va. 294, 299, 551 S.E.2d 650, 653 (2001).

In the present case, Merritt was found guilty on July 3, 2007, he was sentenced on July 15, 2008, and he filed his notice of appeal in the trial court on July 31, 2008. On November 17, 2008, Merritt filed with the circuit court the motion to set aside the verdict and a motion for a new trial based on newly discovered evidence, four months after the sentencing order and appeal were filed. The circuit court judge in a letter dated December 9, 2008, dismissed the motion on the basis that the circuit court lacked jurisdiction to hear it since the case was pending before this Court. On April 13, 2009, Merritt filed a motion to set aside the jury verdict and grant a new trial with this Court. However, this Court does not have jurisdiction to hear this motion since it was not ruled on by the trial court, and this Court only has jurisdiction over appeals "from action[s by the trial court] on motions filed and disposed of while the trial court retains jurisdiction over the case." *Id.* Therefore, we deny the motion.

## II. *Sufficiency of the Evidence*

■ When the sufficiency of the evidence is challenged on appeal, "we 'presume the judgment of the trial court to be correct' and 'will not set it aside unless it is plainly wrong or without evidence to support it.' " *Davis v. Commonwealth,* 39

Va.App. 96, 99, 570 S.E.2d 875, 876–77 (2002) (quoting *Broom v. Broom,* 15 Va.App. 497, 504, 425 S.E.2d 90, 94 (1992); *Dodge v. Dodge,* 2 Va.App. 238, 242, 343 S.E.2d 363, 365 (1986)). We do not "substitute our judgment for that of the trier of fact." *Wactor v. Commonwealth,* 38 Va.App. 375, 380, 564 S.E.2d 160, 162 (2002). "Practically speaking, this means a jury's decision cannot be disturbed on appeal unless no 'rational trier of fact' could have come to the conclusion it did." *Seaton v. Commonwealth,* 42 Va.App. 739, 746, 595 S.E.2d 9, 12–13 (2004) (citing *Kelly v. Commonwealth,* 41 Va.App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc)).

■ The reviewing court, under this standard, does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original and citation omitted). Instead, the reviewing court asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

■ In reviewing the sufficiency of the evidence to support a conviction, "we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each and every element of the charged offense." *Haskins v. Commonwealth,* 31 Va.App. 145, 149–50, 521 S.E.2d 777, 779 (1999). "[W]hen we consider the sufficiency of the evidence we do not consider each piece of evidence in isolation. Instead, we review the totality of the evidence to determine whether it was sufficient to prove an offense." *Bowling v. Commonwealth,* 51 Va.App. 102, 107, 654 S.E.2d 354, 356 (2007) (citing *Commonwealth v. Duncan,* 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004)).

 To convict an individual of possession of a controlled substance, " 'the Commonwealth must prove that the defendant was aware of the presence and character of the drugs and that he intentionally and consciously possessed them.' " *Castaneda v. Commonwealth*, 7 Va.App. 574, 583, 376 S.E.2d 82, 87 (1989) (quoting *Andrews v. Commonwealth*, 216 Va. 179, 182, 217 S.E.2d 812, 814 (1975)). Possession can be proven " 'by showing either actual or constructive possession.' " *Birdsong v. Commonwealth*, 37 Va.App. 603, 607, 560 S.E.2d 468, 470 (2002) (quoting *Barlow v. Commonwealth*, 26 Va.App. 421, 429, 494 S.E.2d 901, 904 (1998)).

> To support a conviction based on constructive possession, "the Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the substance and that it was subject to his dominion and control."

*Id.* at 607–08, 560 S.E.2d at 470 (quoting *Glasco v. Commonwealth*, 26 Va.App. 763, 774, 497 S.E.2d 150, 155 (1998)). "Proof of constructive possession necessarily rests on circumstantial evidence; thus, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.' " *Burchette v. Commonwealth*, 15 Va.App. 432, 435, 425 S.E.2d 81, 83 (1992) (quoting *Garland v. Commonwealth*, 225 Va. 182, 184, 300 S.E.2d 783, 784 (1983)); *see also McMorris v. Commonwealth*, 276 Va. 500, 506, 666 S.E.2d 348, 351 (2008) (citations omitted).

 "The possession of drugs need not always be exclusive. It may be shared with another." *Castaneda*, 7 Va.App. at 583, 376 S.E.2d at 87 (citing *Archer v. Commonwealth*, 225 Va. 416, 418, 303 S.E.2d 863, 864 (1983); *Gillis v. Commonwealth*, 215 Va. 298, 301–02, 208 S.E.2d 768, 771 (1974)).

> [O]ccupancy of a vehicle ... where illicit drugs are found is a circumstance that may be considered together with other evidence tending to prove that the ... occupant exercised

dominion and control over items in the vehicle ... in order to prove that the ... occupant constructively possessed the contraband; however, ... occupancy alone is insufficient to prove knowing possession of drugs located ... in a vehicle. Furthermore, proof that a person is in close proximity to contraband is a relevant fact that, depending on the circumstances, may tend to show that, as an ... occupant ... of a vehicle, the person necessarily knows of the presence, nature and character of a substance that is found there. However, in order for ... occupancy ... of a vehicle to be sufficient to support the inference that the ... occupant also possessed contraband that was located ... in the vehicle, the ... occupant must be shown to have exercised dominion and control over the premises and to have known of the presence, nature, and character of the contraband at the time of such ... occupancy.

*Burchette,* 15 Va.App. at 435, 425 S.E.2d at 83–84 (citations omitted); *see also Castaneda,* 7 Va.App. at 584, 376 S.E.2d at 87 ("Although mere proximity to the drugs is insufficient to establish possession, and occupancy of the vehicle does not give rise to a presumption of possession, ..., both are factors which may be considered in determining whether a defendant possessed drugs.").

An individual is guilty of transporting into the Commonwealth one ounce or more of a controlled substance if he transported it "into the Commonwealth by any means with intent to sell or distribute." Code § 18.2–248.01.

 To convict an individual of conspiracy, there must be

" 'an agreement between two or more persons by some concerted action to commit an offense.' " The agreement is the essence of the offense; it is not necessary that the crime be fully consummated. Moreover, "[a] conspiracy may be proved by circumstantial evidence." "Indeed, from the very nature of the offense, [a conspiracy] often may be established only by indirect and circumstantial evidence."

*Hodge v. Commonwealth,* 7 Va.App. 351, 355, 374 S.E.2d 76, 79 (1988) (internal citations omitted). In this case, the Commonwealth had the burden of proving that there was an agreement to possess the ecstasy with the intent to distribute it.

The jury was instructed that they could find Merritt guilty as either a principal in the first degree or as a principal in the second degree.

> "A principal in the first degree is the actual perpetrator of the crime. A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime. In order to make a person a principal in the second degree actual participation in the commission of the crime is not necessary. The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree."

*Muhammad v. Commonwealth,* 269 Va. 451, 482, 619 S.E.2d 16, 32–33 (2005) (quoting *Jones v. Commonwealth,* 208 Va. 370, 372–73, 157 S.E.2d 907, 909 (1967)). "A principal in the second degree is, therefore, required under this test to 'share the criminal intent of the actual perpetrator or be guilty of some overt act,'... which are questions of fact to be resolved by the fact finder." *Goode v. Commonwealth,* 52 Va.App. 380, 386, 663 S.E.2d 532, 535 (2008) (quoting *Muhammad,* 269 Va. at 482, 619 S.E.2d at 33).

In this case, the evidence was insufficient to sustain the convictions. The Commonwealth's position at trial and on appeal is that Merritt was aware of the contents of the suitcase and acted as a lookout or "enforcer" while the suitcase containing ecstasy was transported from the bus to the car. While a fact finder is entitled to draw reasonable inferences from proven facts, as noted above "all circumstances proved must be consistent with guilt and inconsistent with innocence and exclude all reasonable conclusions inconsistent

with guilt." *McMorris*, 276 Va. at 506, 666 S.E.2d at 351 (citations omitted). Lacking direct evidence to prove Merritt's involvement in his companions' criminal enterprise, the Commonwealth relies on an inference that Merritt was an "enforcer" or "the muscle" for his companions. Unfortunately, this inference urged by the Commonwealth, although apparently accepted by the jury, is based entirely upon speculation, supposition, and suspicion implicit in Detective Fowler's testimony rather than upon sufficiently reliable circumstantial evidence which points inexorably to Merritt's guilt. *See id.* ("[T]o sustain a criminal conviction, the Commonwealth is required to prove more than a suspicion of guilt or probability of guilt.").

Here, the record is simply devoid of evidence from which a fact finder, without resorting to speculation, could reasonably conclude that Merritt knew of the presence and character of the drugs or that he knowingly and intentionally possessed them, whether actually or constructively. Merritt never exercised dominion and control over the vehicle or the suitcase with the drugs, nor does the evidence show that he had knowledge of the "presence, nature, and character" of the drugs such that his occupancy of the vehicle and close proximity to the drugs could support the conclusion that he constructively possessed them. With regard to the vehicle, Merritt was merely an occupant. He arrived in the vehicle in the passenger seat, got out of the vehicle, and then returned to the passenger seat after everyone else was already in the Lexus. None of his actions show that he exercised dominion or control over the vehicle.

In addition, Merritt did not exercise dominion and control over the incriminating items in the vehicle, i.e. the suitcase with the drugs. Spratley and McDaniels possessed the suitcase in which the drugs were discovered, and admitted to the officers that they were the owners and had purchased it that day in New York. Bolton was the one who assisted them in placing the suitcase in the trunk. Merritt never touched the suitcase nor did he go near it at any time during the evening. The circumstances in this case are not inconsistent with

innocence, and do not exclude every reasonable hypothesis of innocence with regard to the circumstances in this situation such that it can only be concluded that Merritt is guilty of possession of a controlled substance. Here, the Commonwealth proved nothing beyond Merritt's mere presence and a suspicion that he was involved in his companions' activities based primarily upon his apparent failure to speak into a cell phone he was holding to his ear. Thus, the evidence was insufficient to prove beyond a reasonable doubt that Merritt was guilty of constructively possessing the drugs with the intent to distribute them.

 Also, the evidence does not support the conclusion that Merritt was a principal in the second degree as an "enforcer" or the "muscle" of the drug activity such that he knew that McDaniels and Spratley were delivering drugs, that the suitcase contained drugs, and that he conspired to possess the drugs with the intent to distribute. In order to support a conviction as a principal in the second degree, "[t]he Commonwealth must prove that the defendant consented to the felonious purpose and . . . contributed to its execution." *McMorris,* 276 Va. at 505, 666 S.E.2d at 351 (citations omitted). In order to be the "muscle" of the group, Massetti testified as an expert that such an individual is typically bigger physically or armed in order to protect the product or the distributor. The record does not show that Merritt was bigger physically nor does it show that he was armed.[7] The only weapon found on Merritt was the small knife that was part of his belt. With regard to the gun, Bolton was the one who informed the officers of its presence in the vehicle, and he claimed ownership of it. While Merritt did not act surprised when Bolton stated the gun was in the center console, the record does not reflect that Merritt ever carried or possessed the gun at any time, much less

---

7. The dissent takes the position that "Merritt never made his physical build an issue at trial." The dissent is correct. It was the Commonwealth that did so through its expert's testimony speculating that Merritt was an "enforcer" or "muscle" and it was the Commonwealth which failed to present any evidence that linked Merritt to the factors its expert testified were significant.

during his supposed parking lot sojourn as an "enforcer." In short, the evidence does not show circumstantially or indirectly that Merritt aided and abetted his companions to commit the offense of possession with the intent to distribute by being the "muscle" or lookout of the group.[8]

Lastly, and for the same reasons, the evidence is legally insufficient to prove more than a strong suspicion that Merritt was involved in transporting the drugs into Virginia. The facts before us show that there was a Western Union receipt transferring $125 to Merritt in New York a few days prior to the evening of McDaniels' and Spratley's arrival with the drugs, a notebook containing the notation "GMNY 1000," the assignment by Bolton of "G–Money" in his cell phone to the number of one of the cell phones found on Merritt, and expert testimony at trial establishing that the possession by Merritt's companions of 998 tablets of ecstasy, the packaging, and the 800 baggies' receipt were inconsistent with personal use. However, the Western Union receipt, the receipt for the baggies, and the drug notebook were all found in the backseat where Bolton had been sitting. Any inference that these isolated facts when considered together prove that Merritt shared the criminal intent of his companions to import ecstasy into the Commonwealth must be based upon sheer speculation and certainly do not rise to the level of proof beyond a reasonable doubt. Therefore, we conclude that the evidence was insufficient to sustain the convictions and we reverse the convictions and dismiss the indictment.

*Reversed and dismissed.*

---

8. From the fact that Merritt walked from the bus to the car while holding a cell phone to his ear without being observed to speak into it coupled with Massetti's testimony that drug dealers often use an "enforcer" or "muscle," the dissent concludes that "[t]he only logical inference" is that Merritt was aiding and abetting the transportation and distribution of ecstasy into the Commonwealth. We simply disagree. As noted, there is no evidence in the record that Merritt was armed or that he had the physical stature to intimidate others. In short, Massetti's testimony does not represent an expert opinion based upon the application of objective criteria but rather constitutes the sheerest speculation and suspicion which, no matter how strong, do not support logical inferences that satisfy the reasonable doubt standard.

McCLANAHAN, J., concurring, in part, and dissenting, in part.

I concur in the majority's conclusion that Merritt's argument regarding his motion to suppress was not preserved and in the denial of the motion to set aside the verdict for after-discovered evidence. However, I respectfully dissent from the majority's reversal of the convictions. Reviewing the evidence in the light most favorable to the Commonwealth, *Commonwealth v. Hudson*, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003), I disagree the evidence was insufficient for the jury to conclude Merritt was guilty.

Merritt and Bolton arrived at a bus station known as a major pipeline of narcotics into the city in a vehicle that was ultimately parked in a dark area of the lot facing the road to provide easy access back to the highway. Merritt was observed "shadowing" the movements of McDaniels and Spratley, holding a cell phone to his ear without speaking into it or showing any emotion, and continually "scanning" the parking lot. While McDaniels and Bolton placed the drugs into the trunk of the vehicle, Merritt posted himself behind them as he continued to scan the parking lot. Merritt's actions were described as being consistent with the actions undertaken by police officers conducting surveillance of undercover detectives in that Merritt attempted to be covert, work with his environment, and act disinterested without drawing attention to himself. In fact, Merritt's actions to protect the safety of the drug transaction were compared to the actions of a surveillance officer in protecting the safety of an undercover officer.

At no time did Merritt acknowledge McDaniels or Spratley while following them in the parking lot thus supporting the reasonable inference that he was not there to meet them and lead them to the vehicle.[9] The only logical inference from this evidence is that Merritt was acting as a lookout while McDan-

---

9. Merritt's explanation to police that Bolton told him to get out of the vehicle and walk to the bus upon their arrival at the bus station, without giving him any reason for doing so, was understandably rejected by the jury as not credible.

iels and Spratley transported the drugs through the parking lot. Although Merritt claimed not to know Bolton, McDaniels or Spratley well, he told Detective Massetti that "Tony," Anthony McDaniels, was the one who "wheeled the bag across the parking lot" indicating a sufficient familiarity with McDaniels to use a nickname. Furthermore, calls to McDaniels were found in Merritt's cell phone. In fact, police discovered a large number of phone calls made between the cell phones found on Merritt, Bolton, and McDaniels in the several days immediately preceding the arrest.

In addition to Merritt's actions at the bus station supporting his role as the "lookout" for this transaction and the phone calls linking him to the other individuals involved in the drug transaction, police recovered evidence supporting the jury's finding that Merritt possessed and was directly involved in the transportation and distribution of illegal drugs. A plastic baggie corner containing drug residue was found on the ground next to the front passenger's door of the vehicle where Merritt was sitting, and its location and condition were consistent with having recently fallen out of the front passenger's side of the vehicle. Within the vehicle, police recovered a drug notebook containing notes regarding the subject drug transaction specifically identifying the transaction as "GMNY 1000," which the jury could reasonably infer referred to Glen Merritt, New York, and the quantity of ecstasy pills, of which 998 were recovered by police. With this notebook were four bus tickets for transportation between Norfolk and New York and receipts dated August 5 for a large number of baggies. In addition, the police recovered a Western Union receipt showing a payment of $125 from Bolton to Merritt that he received in New York on August 2. According to expert testimony, Western Union is commonly used in the drug industry for payments for services and the $125 was likely sent to Merritt for an additional night's stay in New York and/or his transportation back to Virginia.[10] Two cell phones

10. Although the majority points out these items were found in the backseat where Bolton had been sitting, in my view their location in the

were recovered from Merritt further supporting his involvement in the transaction since the use of two cell phones is common in the narcotics trade. Further, one of Merritt's cell phone numbers was identified as "G-money" in Bolton's cell phone.

From this evidence, the jury could reasonably infer Merritt was in New York days before the arrest to arrange the purchase of 1,000 ecstasy pills and served as a "lookout" as the drugs were transported for the purpose of further distribution. Thus, I would find the evidence was sufficient to prove Merritt conspired with his companions to possess and transport the drugs with intent to distribute them and was "present lending countenance, or otherwise aiding" the possession of the drugs with intent to distribute and the transportation of the drugs into Virginia with intent to distribute. *Muhammad v. Commonwealth,* 269 Va. 451, 482, 619 S.E.2d 16, 32–33 (2005). *See Foster v. Commonwealth,* 179 Va. 96, 99, 18 S.E.2d 314, 315–16 (1942) ("Every person who is present at the commission of a [crime], encouraging or inciting the same by words, gestures, looks, or signs, or who in any way, or by any means, countenances or approves the same is, in law, assumed to be an aider and abettor, and is liable as principal."); *Dunn v. Commonwealth,* 52 Va.App. 611, 665 S.E.2d 868 (2008).[11]

Accordingly, I would affirm the trial court's judgment.

---

vehicle is not significant. What is significant, however, is that the items, which were clearly evidence of the drug transaction, were found together and included not only a Western Union receipt for money sent to Merritt in New York, but a description of the transaction as "GMNY," which the jury could infer referred to Glen Merritt. Thus, these references to Merritt, found among the other items, linked Merritt to the transaction.

11. Although the majority states the evidence does not show Merritt was "bigger physically" or that "he was armed," Merritt never made his physical build an issue at trial and the jury was in the best position to observe Merritt and judge whether his stature was consistent with the role of a "lookout" or "muscle" in the transaction. Furthermore, the police found a handgun in the console next to where Merritt was sitting and a magazine in the glove compartment. Therefore, the jury could

reasonably infer Merritt had access to a firearm and, as the Commonwealth argued, could have been carrying the gun in the parking lot before he returned to the vehicle.