COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Raphael and Bernhard
Argued by videoconference

ANTHONY ELIJAH PERKINS

                                                          OPINION BY
v.        Record No. 0323-25-4              JUDGE DAVID BERNHARD
                                                       MARCH 31, 2026
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Angela L. Horan, Judge

Collin Chayce Crookenden (Vanderpool, Frostick & Nishanian, P.C.,
on briefs), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,[1]
Attorney General, on brief), for appellee.

A jury convicted Anthony Elijah Perkins of first-degree murder (two counts), conspiracy
to commit murder, and criminal gang participation.  Perkins requested jury sentencing, which
fixed his sentence at 70 years' incarceration.  The trial court imposed the 70-year sentence, with
10 years suspended.  On appeal, Perkins argues that the trial court erred in giving certain jury
instructions.  He also challenges the sufficiency of the evidence to sustain his convictions.

This Court finds Perkins's convictions for two counts of first-degree murder, conspiracy
to commit murder, and criminal gang participation are all amply supported by evidence.  Perkins
issued a standing kill directive, identified the target, coerced compliance through a death threat,
and coordinated the murders in real time through Instagram—conduct from which a rational jury
could find, beyond a reasonable doubt, that Perkins was constructively present at the scene.  He
assigned each participant his role, directed the common enterprise from inception through its

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

final moments, and remained in active contact with the shooters until hours before the killings, rendering him criminally liable as both a principal in the second degree and an accessory before the fact. Because the jury instructions on both theories correctly stated Virginia law, including the doctrine of constructive presence, and were each supported by more than a scintilla of evidence, no error occurred in the trial court's rulings. The criminal gang participation conviction follows necessarily from the others, as Perkins himself conceded, given that he directed these murders for the benefit of the Bloods criminal street gang.

Accordingly, the judgment of the circuit court is affirmed.

BACKGROUND[2]

Antoine Geter[3] and TreSean Keene were close childhood friends. They were about 14 years old in the spring of 2021 when they met Perkins[4] at a cookout. Perkins had a red bandana "sticking out of his back pocket," indicating that Perkins was a member of the "Bloods" gang. Geter and Keene wanted to be a part of the gang[5] and asked Perkins how to "get down." Perkins said to join, they "would have to put in work" for the gang. Geter understood that they would

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

[3] Geter is referred to in the record as "Ant" or "Twaan."

[4] Geter and Keene refer to Perkins by the nickname "V."

[5] Keene's testimony was equivocal about his desire to be a member of the Bloods gang, but he said that he was "friends" with members of the gang. Geter testified that Keene was present and a part of the conversation with Perkins at the cookout, suggesting that they both were interested in being involved with the gang.

have to "prove" themselves by getting "jumped in," committing a robbery, or the like. Geter and Keene continued to maintain contact with Perkins through social media, "mainly Instagram."[6]

Geter and Perkins met "about three more times" over the following year. Eventually, Perkins gave Geter a directive. Perkins was "beefing" with rival gang members and told Geter to "get them out of the way." Geter was to wait for Perkins's order. Geter knew this meant he had to kill the rival gang members when told to do so. He feared if he did not follow through with Perkins's orders, he could be killed.

On Friday, May 13, 2022, Geter and Keene went to a party at Malik Davis's[7] apartment. Keene arrived armed with a gun in a "fanny pack." Among the guests at the party was Davis's friend, Christian Roberts. While at the party, Keene posted photos on his Instagram account using Geter's phone. The party continued through Friday night and into Sunday.

On Sunday morning, May 15, 2022, at 1:04 a.m., in response to the photos, Keene received a message on Instagram from Perkins inquiring whether Davis was a "Crip."[8] Perkins believed that Davis might have been involved with a rival gang and told Keene and Geter to "keep eyes on" him. Perkins later directed Geter and Keene to kill Davis and said he would let them know when he "want[ed]" them "to do it," because he "wan[ted] to be there."

While Geter and Keene awaited Perkins's order, they devised a plan to kill Davis. They knew Davis was armed with a gun. So, Geter planned to ask to borrow Davis's gun to pose for a picture. They also believed that Roberts was armed, so Geter planned to shoot Roberts first,

---

[6] Perkins's Instagram username is "xertifiedslime93x." Geter's username is "2kutthroat.antt." Keene's username is "young.doublee."

[7] Davis is intermittently referred to as "Leak" in the record.

[8] The record suggests that Perkins did not know Davis by name but that the two had interacted on at least one occasion. Davis was wearing a brown jacket in the photos that Keene posted on Instagram. The message Keene received from Perkins sought to clarify whether the person "in the brown jaxket [sic]" was a "Crip."

"just in case." Keene was going to wait in the bathroom until he heard the first shot, then come out with his gun and assist Geter.

Without waiting for Perkins to arrive though, the two put their plan into motion. Geter asked to hold Davis's gun for a picture, and when Davis handed Geter the gun, he shot Roberts in the head from "about three feet" away. He then fixed the gun on Davis and started firing. Keene came out of the bathroom and shot at Davis. As the two fled the apartment, Geter "heard [Davis] cry out." Geter returned to where Davis was lying on the ground and "finished the job."

Geter was arrested at school four days later. Initially, he was not forthcoming with police about the incident. Geter was afraid that Perkins would harm him or his family if he "snitch[ed]." But in an interview with Detective Andersen about four months after the murders, he disclosed Keene's involvement. Police arrested Keene a few days later. Keene's initial interviews with police were also evasive. While police were aware of Perkins's possible involvement, Geter and Keene concealed the extent of his role in the incident. So, after further investigation and a series of interviews with Geter and Keene over the course of eight months, Perkins was directly indicted and arrested about a year and a half after the shooting.

At trial, Geter and Keene admitted that they shot and killed Davis and Roberts. They also conceded that Perkins was not present when the killing occurred, nor had he given them the means to kill Davis and Roberts. Geter testified that Perkins directed him, "orally" and "in person," to "kill" a rival gang member. Geter did not want to kill Davis, but Perkins threatened "to kill [Geter]" if he "didn't do the work." He further testified that he would not have killed Roberts if Perkins "hadn't told [him] to kill" Davis. Though Keene denied that he posted photos to his Instagram account or conversed with Perkins through his account on the night of the murders, the Instagram messages between Perkins's account and Keene's account were entered into evidence.

Detective Darien Cupka, a certified specialist in gang investigation, testified as an expert for the Commonwealth. In his time investigating gang activity, Cupka had seen a lot of gang communication through Instagram. Regarding Perkins's Instagram username, "xertifiedslime93x," Cupka explained that Bloods typically replace the letter "c" with an "x," and that the "93" was likely a reference to the "9 Trey Gangster Bloods." Cupka indicated "Nine Trey" is one of the "most prominent" and "most violent" subsets of the Bloods gang. The messages between Perkins and Keene indicated that Perkins believed that Davis was "at least an associate" of a rival gang. Cupka further confirmed that the rival gang was active in Prince William County. Cupka interpreted Perkins's message thread to be a "directive" to take "some action . . . directed towards" Davis. Cupka emphasized that it was hard to tell exactly what was being said in the message thread because the responses from Keene to Perkins had been deleted. He did note that there was a message from Keene to Perkins, responding to Perkins's assertion that he "want[ed] to be there," which Perkins "liked."

Perkins stipulated to his membership in the Bloods contemporaneously with the murders. He also conceded that his Instagram account was in fact the "xertifiedslime93x" username that had communicated with Keene. He further agreed that "the Bloods, a criminal street gang, have members who individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction."

But Perkins moved to strike the evidence, arguing that the Instagram messages in evidence were only speculative. He argued that he messaged Keene telling them not "to do it" at that time, because he would let them know when they should act. And that he said he wanted to be there when they killed Davis, but he was never there. Perkins insisted that Geter and Keene did the opposite of what he had asked of them by killing Davis when they did. Thus, according

to Perkins, he did not have a shared intent with Geter and Keene because he told them, "[D]on't do it now." Perkins also argued that Geter had his own motivations to kill Davis. Regarding Roberts, Perkins asserted that he did not even know Roberts was there and therefore could not possibly have "[i]ncited, encouraged, aid[ed], abetted, demanded, order[ed], [or] directed" Roberts's murder. He made similar arguments concerning the charges for conspiracy to commit the murders. The trial court granted Perkins's motion to strike the charge of conspiracy to murder Roberts but sent the remaining charges to the jury.

The trial court instructed the jury that a "principal in the second degree" and an "accessory before the fact" are liable just the same as "the person who actually committed the crime." Perkins objected to the form of the trial court's instruction on principal in the second degree.[9] Perkins also objected to instructing the jury on accessory before the fact, asserting that it was a separate charge altogether, and not just a theory on which the jury could convict him for murder. The trial court rejected Perkins's arguments and instructed the jury on both theories. The jury convicted Perkins on both remaining charges of first-degree murder, conspiracy to murder Davis, and criminal gang participation. Perkins appeals.

ANALYSIS

*I. Jury Instructions*

"We review a circuit court's decision to grant or deny a proposed jury instruction for an abuse of discretion." *Commonwealth v. Kartozia*, 304 Va. 321, 331 (2025). "We apply the deferential abuse of discretion standard alongside our recognition that '[a] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to

---

[9] Perkins's proffered instruction on principal in the second degree included the language, "[a] principal in the first degree is the person who actually commits the crime." He objected to the Commonwealth's proffered instruction, which did not include that language, but was otherwise the same.

support that theory and if the instructions correctly state the law.'" *Id.* at 332 (alteration in original) (quoting *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004)). "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

Perkins argues that the trial court erred when it instructed the jury on the law concerning principal in the second degree and accessory before the fact. He claims that there was not sufficient evidence to support instructing the jury on either theory. Perkins's arguments on appeal differ somewhat from his objections at trial, where he generally challenged the propriety of the instruction's language rather than the sufficiency of evidence to support giving the instructions at all. Assuming without deciding that his objections were stated with sufficient certainty to preserve the evidentiary-support issue for appeal, *see* Rule 5A:18, we reach the merits and find no error in either instruction.

"A principal in the second degree . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005) (quoting *Jones v. Commonwealth*, 208 Va. 370, 372 (1967)). A principal in the second degree does not have to be physically present when the crime occurs. *Sutton v. Commonwealth*, 228 Va. 654, 667 (1985). Where "several persons set out together" for the purpose of carrying out an unlawful "common design" and "each takes the part assigned him," any one of those several persons may be found constructively present when the crime is committed. *Id.*

Constructive presence does not require physical proximity to the scene. *Id.* at 667. Here, the sequence of events from Perkins's initial directive at the cookout to his real-time Instagram coordination on the night of the murders precisely demonstrates the structure *Sutton* describes. Perkins assigned Geter and Keene their roles—surveillance, execution, and gang initiation through violence—and actively managed the enterprise by identifying the target, issuing the kill directive, and remaining in contact with the executors until just hours before the murders.

An accessory before the fact is "not present at the commission of the offense," but was "in some way" involved before commission of the crime, as a "contriver, instigator or adviser." *Littlejohn v. Commonwealth*, 24 Va. App. 401, 409 (1997) (quoting *Hitt v. Commonwealth*, 131 Va. 752, 759 (1921)). Thus, a conviction as an accessory before the fact requires that the accused knew or had "reason to know of the principal's criminal intention" and "intend[ed] to encourage, incite, or aid the principal's commission of the crime." *McGhee v. Commonwealth*, 221 Va. 422, 427 (1980).

The trial court instructed the jury that:

> A princip[al] in the second degree, is a person who did not actually commit the crime, but rather is present and knowingly assists by helping in the commission of the crime. It must be shown that he intended by his words, gestures, signals, or actions to encourage, advise, urge[,] [o]r help the person who actually committed the crime[,] and shared the criminal intent of the person who actually committed the crime. Presence and consent alone are not sufficient to make a person a princip[al] in the second degree.

> A princip[al] in the second degree is liable for the same punishment as the person who actually committed the crime. A person is considered present at the scene of a crime if he was in a place to incite, encourage, advise, or assist in the commission of the crime. Presence may be actual or constructed [sic].

> There is constructive presence when several persons set out on a common unlawful purpose, and each takes the part assigned to him for the success of the common enterprise.

The trial court further instructed that:

> An accessory before the fact is one who was not present at the time of the commission of the Murder but who, before the commission of the Murder, in some way encouraged, incited or aided in the commission of the Murder knowing or having reason to know of the intent of the principal to commit the Murder. An accessory before the fact is liable for the same punishment as the person who actually committed the crime.

Perkins told Geter he would have to kill rival gang members to join the Bloods. On the night of the murders, Perkins sent Keene messages on Instagram ordering them to kill a rival gang member. Geter and Keene acted on Perkins's instructions. Perkins correctly asserts that a jury instruction must be supported by "more than a scintilla" of evidence. *Kartozia*, 304 Va. at 332. But in arguing that there was no evidence that he was present during the murders, he fails to acknowledge the law concerning constructive presence of a principal in the second degree. Perkins's instruction to delay, rather than to stand down entirely, is fully consistent with continued participation in and oversight of the common design.

Moreover, "[t]he amount of incitement or encouragement to commit the crime is irrelevant if the encouragement in fact induces the principal to commit the offense." *McGhee*, 221 Va. at 427. Perkins's real-time engagement through Instagram on May 15, 2022, including his "liking" of Keene's final deleted message at 2:41 a.m., underscores that he remained an active, constructively present participant in the enterprise until the moment the shooters acted. More than a scintilla of credible evidence supported the jury instructions. *See Kartozia*, 304 Va. at 332. The instructions also properly stated the law. *See Muhammad*, 269 Va. at 482; *Sutton*, 228 Va. at 667; *Littlejohn*, 24 Va. App. at 411. Thus, Perkins has not demonstrated that any error occurred in the trial court's giving of either instruction. *See Kartozia*, 304 Va. at 332; *Muhammad*, 269 Va. at 482; *Sutton*, 228 Va. at 667; *Littlejohn*, 24 Va. App. at 411.

*II. Sufficiency of the Evidence*

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

*A. First-Degree Murder*

"Murder . . . by any willful, deliberate, and premeditated killing . . . is murder in the first degree." Code § 18.2-32. "In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18. A principal in the second degree must have "share[d] the criminal intent of the party who actually committed" the crime or must be "guilty of some overt act in furtherance thereof." *Allard v. Commonwealth*, 24 Va. App. 57, 62 (1997)

- 10 -

(alteration in original) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 540 (1991)).  A conviction as an accessory before the fact requires proof that the defendant knew or had reason to know "of the principal's criminal intention" and intended to "encourage, incite, or aid the principal's commission of the crime."  *McGhee*, 221 Va. at 427.  Presence during commission of the crime is the "sole" distinguishing factor between the theories of principal in the second degree and accessory before the fact.  *Id.* at 426 n.3.

That distinction is meaningful here because the same conduct—Perkins's standing directive to kill a rival gang member, his real-time Instagram coordination on the day of the murders, and his death threat ensuring Geter's compliance—satisfies the elements of both theories simultaneously.  Code § 18.2-18 provides that "[i]n the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree."  Under either theory, intent "may be proved by circumstantial evidence," *Creamer v. Commonwealth*, 64 Va. App. 185, 205 (2015), and "may, and often must, be inferred" from the defendant's "conduct and statements," *Hughes v. Commonwealth*, 18 Va. App. 510, 520 (1994) (en banc), a determination that rests "within the province of the jury," *id.* at 519 (quoting *Ingram v. Commonwealth*, 192 Va. 794, 802 (1951)).  Under the principal-in-the-second-degree theory, the sequence of conduct—standing directive, real-time target identification, kill order, expressed intent to be present, and final Instagram contact just hours before the murders—permitted the jury to infer that Perkins directed the common enterprise up to the moment of execution, placing him constructively at the scene.  *Sutton*, 228 Va. at 667; *Muhammad*, 269 Va. at 482.  Under the accessory-before-the-fact theory, that same direction and coercion, occurring before and in anticipation of the killings, permitted the jury to infer the knowing encouragement and incitement the law requires.  *McGhee*, 221 Va. at 427; *Littlejohn*, 24 Va. App. at 409.  Whether

the jury convicted on one theory or the other, the evidence sustains the verdict under either. *Allard*, 24 Va. App. at 62.

### 1. Malik Davis

Perkins argues that he was not involved in Geter and Keene's plan to murder Davis. He insists that they acted on their own because he was going to let them know "when he wanted them to take action," but they did not wait for his order. Rather, he argues, they "took matters into their own hands." In support of this argument, Perkins highlights Geter's testimony that he and Keene planned the specifics of how the shooting would take place.

On the day of the murder, May 15, 2022, Perkins inquired whether Davis was part of a rival gang. Once he believed that Davis was at least associated with a rival gang, he directed Geter and Keene to "keep eyes on" him and that he would let them know "when [he] want[ed] [them] to do it." Geter did not want to kill Davis, but Perkins threatened severe retribution if he did not. Perkins informed Keene and Geter that he "wan[ted] to be there" when they killed Davis. Cupka testified that there were deleted communications from the Instagram message thread. Cupka noted that there was a message they could no longer read from Keene responding to Perkins's assertion that he wanted to be present for the killing of Davis. Perkins "liked" the missing message from Keene at 2:41 a.m., which was the last correspondence between Perkins, Geter, and Keene before police found Davis and Roberts's bodies shortly after 6:00 p.m.

Whether Perkins's Instagram messages, along with other evidence, evinced a shared intent with Geter and Keene to kill Davis was a factual question for the jury. *Hughes*, 18 Va. App. at 519-20. Perkins's assertion that he did not have the requisite intent because he wanted them to wait to kill Davis is inconsequential because "[t]he amount of incitement or encouragement to commit the crime is irrelevant if the encouragement in fact induces the principal to commit the offense." *McGhee*, 221 Va. at 427. There was evidence supporting the

- 12 -

jury's determination, and the jury "determines which reasonable inferences should be drawn from the evidence." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017).

The same evidence supports Perkins's conviction whether the jury reached its verdict under the theory of principal in the second degree or accessory before the fact. Under the principal-in-the-second-degree theory, Perkins's real-time direction of the enterprise, including his identification of the target, his kill order, and his continued Instagram engagement until just hours before the killings, places him constructively at the scene within the meaning of *Sutton*, 228 Va. at 667. Under the accessory-before-the-fact theory, that same course of conduct satisfies *McGhee*'s requirements of knowledge of the principals' criminal intention and intent to encourage, incite, or aid the commission of the murders. *McGhee*, 221 Va. at 427. Because presence is the sole distinguishing factor between the two theories, *id.* at 426 n.3, and because the evidence is sufficient under either, there is no basis to disturb the jury's verdict.

### 2. Christian Roberts

Perkins argues that he did not even know Roberts existed and that Geter and Keene acted alone in killing him "just in case" Roberts posed a threat. Thus, Perkins advances he did not have the requisite intent to murder Roberts. "[L]ack of intent is usually a defense to a conviction as" an aider or abettor, unless "there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act." *McMorris v. Commonwealth*, 276 Va. 500, 505-06 (2008). Concerted action "has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme." *Rollston*, 11 Va. App. at 542 (quoting Black's Law Dictionary 262 (5th ed. 1979)).

Even as to Roberts, whom Perkins did not know was present, the concert of action doctrine forecloses any personal lack of intent defense. *See McMorris*, 276 Va. at 505–06.

Geter testified that he planned to shoot Roberts first "just in case," because both he and Keene believed Roberts was armed. Roberts's death was a foreseeable consequence of Perkins's scheme to kill an armed man in a room with at least one other armed person. "[T]he law is well settled in Virginia that each co-actor is responsible for the acts of the others, and may not interpose his personal lack of intent as a defense." *Carter v. Commonwealth*, 232 Va. 122, 126 (1986).

Perkins told Geter and Keene that they would need to "put in work" to join the Bloods. Cupka explained that "to put in work," could be anything from selling drugs, stealing, or committing acts of violence to benefit the gang. Where "the original plan" is "for a wrongful purpose," an aider and abettor may be criminally liable for a principal's actions. *Rollston*, 11 Va. App. at 542. The evidence permitted the jury to conclude that Perkins set in motion the plan for the wrongful killing of Davis. And the very testimony that Perkins highlights in support of his lack of intent to kill Roberts, that Geter planned to shoot Roberts first "just in case," demonstrates that Roberts's death was a natural and probable consequence of Davis's murder. As we have recognized, "[a]n incidental and probable consequence of the use of a firearm" in the commission of a felony "is that someone will get killed." *Jones v. Commonwealth*, 15 Va. App. 384, 389 (1992).

*B. Conspiracy to Commit Murder*

Perkins argues that Geter and Keene devised their own plan to murder Davis. He claims that he was not part of an agreement to kill Davis because he instructed Geter and Keene "not to attack Davis *yet*." We disagree.

"A conspiracy is an agreement between two or more persons by some concerted action to commit an offense." *Gray v. Commonwealth*, 260 Va. 675, 680 (2000). "The agreement is the essence of the offense," *Merritt v. Commonwealth*, 55 Va. App. 719, 734 (2010) (quoting *Hodge*

*v. Commonwealth*, 7 Va. App. 351, 355 (1988)), and it is completed "when the parties agree to commit an offense," *Gray*, 260 Va. at 680. Conspiracy "may be proved by circumstantial evidence. Indeed, because of the very nature of the offense, 'it often may be established only by indirect and circumstantial evidence.'" *Id.* (quoting *Floyd v. Commonwealth*, 219 Va. 575, 580 (1978)).

The same evidence from which the jury reasonably concluded that Perkins acted as an aider and abettor to Davis's murder, supports its finding that Perkins made an agreement with Keene and Geter to kill Davis. Perkins's desire to be present, and ignorance of Geter and Keene's specific plan, is irrelevant. Once an agreement to commit the unlawful act exists, "[l]iability as a conspirator is not dependent on knowledge of the entire scope of the conspiracy." *Amato v. Commonwealth*, 3 Va. App. 544, 552 (1987) (quoting 16 Am. Jur. 2d *Conspiracy* § 14 (1979)). A co-conspirator's knowledge need not "extend to all the details of the conspiracy." *Id.* (quoting 16 Am. Jur. 2d *Conspiracy*, *supra* § 14). "When one accedes to the conspiracy[,] he sanctions" everything done "in furtherance of the common object." *Id.* at 553.

*C. Criminal Gang Participation*

"Any person who actively participates in or is a member of a criminal street gang and who knowingly and willfully participates in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang is guilty" of criminal gang participation. Code § 18.2-46.2. A "predicate criminal act," under Code § 18.2-46.2, includes "first-degree murder." *Slacedo v. Commonwealth*, 58 Va. App. 525, 537 (2011). Perkins concedes that the charge of criminal gang participation "resolves hand-in-hand with the other three convictions."

Perkins's membership in the Bloods is undisputed. He further agrees that "the Bloods, a criminal street gang, have members who individually or collectively have engaged in the

commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction." Perkins told Geter and Keene that to join the Bloods, they "would have to put in work" for the benefit of the gang. Cupka testified that "putting in work" could mean committing violent acts; and "forms of violence[] and putting fear into other gang members in the community" are an expedient means of rising in the ranks of the gang. These actions benefit the gang by growing its numbers, expanding territory, eliminating competition, and striking fear in rival gangs. From this information, and Geter's and Keene's actions, the jury reasonably could infer that Perkins directed the commission of first-degree murder for the benefit of the Bloods. *See Moseley*, 293 Va. at 464 ("the factfinder determines which reasonable inferences should be drawn from the evidence").

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*